Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs-Appellants Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Resisting Environmental Destruction on Indigenous Lands, and Sierra Club*

Nathaniel S.W. Lawrence (Wash. Bar No. 30847)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Jared E. Knicley (Va. Bar No. 84060)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6242 / F: 202.289.1060
E: jknicley@nrdc.org

*Attorneys for Plaintiff-Appellant Natural Resources Defense Council*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| ALASKA WILDERNESS LEAGUE, ET AL.,<br>*Plaintiffs-Appellants*,<br>v.<br>SALLY JEWELL, ET AL.,<br>*Defendants-Appellees*,<br>and<br>ALASKA OIL AND GAS ASSOCIATION,<br>*Intervenor-Defendant-Appellee*. | No. 15-35559<br><br>**APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3** |

## CIRCUIT RULE 27-3 CERTIFICATE

I, Erik Grafe, certify the following facts to be true, pursuant to Circuit Rule 27-3(a):

1. I am one of the attorneys for Plaintiffs-Appellants Alaska Wilderness League, *et al.* in *Alaska Wilderness League, et al. v. Jewell, et al.*, D. Ct. Case No. 3:15-cv-00067-SLG, Cir. Ct. Case No. 15-35559. This case challenges a regulation that permits the offshore oil and gas industry to harm, or "take," Pacific walruses incidental to offshore oil exploration operations in the Chukchi Sea, in the Arctic Ocean, off Alaska's northern coast. The regulation was issued pursuant to the Marine Mammal Protection Act (MMPA), under which Pacific walruses are protected. The Fish and Wildlife Service has determined that protection of Pacific walruses under the Endangered Species Act also is warranted, although the Service has not yet acted on that determination due to resource constraints.

2. The Appellants request relief as soon as possible and within 21 days to avoid irreparable harm to walruses, and Appellants and their members, from large-scale offshore exploration oil drilling operations in a key Pacific walrus foraging area.

3. Appellants brief submitted herewith provides record and expert evidence that:

a. Activities that will cause harm to walruses have commenced or imminently will commence. The challenged U.S. Fish and Wildlife Service (Service) regulation authorizes Shell Gulf of Mexico Inc. (Shell) to commence drilling operations in the Burger Prospect, a key walrus habitat area in the Chukchi Sea. Shell informed the district court last week that "[m]any of Shell's vessels, including the drilling units, have already begun transiting through the Bering Strait and into the Chukchi Sea, and are expected to be on the Burger Prospect by the third week of July, at which time Shell expects to begin exploration drilling activities." Ex. 22 at 2 (Doc. 74).

b. Shell's planned drilling is an industrial-scale undertaking, involving two large drilling vessels, ice-breakers, anchor handling vessels, tugs, barges, other support vessels, helicopters, and other aircraft. Shell's activities would introduce harmful noise and industrial disturbance into the environment between July and October 2015. This is the same period during which Pacific walruses, including walrus mothers and their young, use the area in large numbers.

c. Industrial noise and disturbance from drilling activities can cause walruses to abandon preferred feeding areas, separate mothers from calves, and increase energy expenditures and stress. The major industrial footprint and loud noises of Shell's operations will likely displace large numbers of walruses from feeding at important habitat in the area where Shell intends to begin drilling shortly. That displacement likely will reduce survival and reproductive success, especially for the most vulnerable females with young, likely leading to durable population-level impacts on Pacific walruses. This likely population level harm to walruses will likely irreparably harm Appellants' and their members' interests.

4. The Appellants diligently have pursued this case to avoid irreparable harm. They initiated this case on November 10, 2014, originally in the District of Columbia District Court, Doc. 1[1], shortly after Shell submitted a request for authorization under the challenged regulation for the large-scale, multi-year drilling operations. Ex. 1. Appellants consistently sought expedited resolution of the merits, which would have avoided the need for interim injunctive relief. On

[1] Since this certificate cites docket numbers to describe the progress of this litigation, the District Court docket sheet is attached as Exhibit 24 to this pleading for the Court's convenience.

December 15, 2014, Federal Respondents sought a change of venue. Doc. 8. The next day, Appellants communicated to Federal Respondents their intent to file a summary judgment motion imminently—even before the government produced an administrative record. Shortly thereafter, Federal Respondents filed a motion seeking to stay summary judgment briefing pending resolution of the venue question. Doc. 11. The District of Columbia District Court granted the stay motion on December 19, 2014. Minute Order of Dec. 19, 2014. While the transfer motion was pending, Federal Respondents provided Appellants with the administrative record and filed a certified index of the record with the District of Columbia District Court. Doc. 23. Appellants then engaged in discussions with Federal Respondents about moving the case forward, and the parties filed a joint motion on March 27, 2015, seeking expedited resolution of the transfer motion on the basis that "[t]he parties believe that prompt resolution of the case is in their interests and the public interest" and noting Appellants' desire to complete summary judgment briefing well in advance of this summer's drilling season. Doc. 24. On April 17, 2015, the District of Columbia District Court issued an order transferring the case to the District of Alaska, Doc. 25, which docketed it on April 29, 2015, Doc. 27.

5. In the Alaska District Court, Appellants requested, Doc. 42, and, over Respondents' objection, Docs. 40 & 41, were granted, Doc. 43, an expedited

briefing schedule for resolution of their summary judgment motion, submitting their opening brief on May 18, 2015, just four days after the Court adopted the schedule and reducing by half their time to reply. (The Federal Respondents requested and were granted an extension for their response brief, Docs. 50, 51 & 52.) Briefing was completed on June 24, 2015. Doc. 56.

6. Interim injunctive relief was not initially necessary, because the District Court had adopted an expedited summary judgment briefing schedule that allowed it to decide the merits of the challenge prior to Shell's drilling season, Doc. 43, and the Service had not granted Shell's request for authorization to conduct its large-scale drilling operations. The Service granted Shell that authorization on June 30, 2015. Ex. 16. Two days later, on July 2, 2015, the District Court issued an order denying Appellants' motion for summary judgment. Ex. 15. Appellants filed a notice of appeal on July 7, 2015, Doc. 60, and on July 8, 2015, a motion for injunction pending appeal, Doc. 63, and a motion to expedite consideration of the motion, Doc. 65. The Court granted in part Appellants' motion to expedite, over Respondents' objection, but granted Respondents some additional time to file an opposition. Docs. 67, 68, 70. Briefing on the motion for injunction pending appeal was completed on July 22, 2015. Doc. 75. On July 23, 2015, the Court denied Appellants' motion for injunction pending appeal, although

it concluded that Appellants "have raised serious legal questions with respect to the regulation's validity." Ex. 23 at 7 (Doc. 76).

7. Since the District Court's denial of Appellants' motion for injunction pending appeal, I have been in email communication with counsel for all parties. The parties agreed to the following expedited briefing schedule for Appellants' motion for an injunction pending appeal with this Court:

> Appellants will file a motion for injunction pending appeal on Tuesday, July 28, 2015 by noon Pacific Time.
>
> Respondents will file a response by Friday, July 31, 2015.
>
> Appellants will file a reply by Monday, August 3, 2015.

8. The parties will be served with this motion through the Court's electronic case filing system.

9. The office addresses, email addresses, and telephone numbers of the parties' counsel are as follows:

Counsel for Plaintiffs-Appellants Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Resisting Environmental Destruction on Indigenous Lands, and Sierra Club:

Erik Grafe
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102
F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.586.2751
F: 907.463.5891
E: ejorgensen@earthjustice.org

Counsel for Plaintiff-Appellant Natural Resources Defense Council:

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Jared E. Knicley
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6242
E: jknicley@nrdc.org

Counsel for Federal Defendants-Appellees Sally Jewell, United States Secretary of the Interior, and the United States Fish and Wildlife Service:

Meredith L. Flax
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
T: 202.305.0404
E: meredith.flax@usdoj.gov

David B. Glazer
U.S. DEPARTMENT OF JUSTICE

Environment & Natural Resources Division
Natural Resources Section
301 Howard Street, Suite 1050
San Francisco, CA 94105
T: 415.744. 6491
E: david.glazer@usdoj.gov

Thekla Hansen-Young
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
P.O. Box 7415, Ben Franklin Station
Washington, D.C. 20044
T: 202. 307.2710
E: thekla.hansen-young@usdoj.gov

Counsel for Alaska Oil and Gas Association, Intervenor-Defendant:

Jeffrey W. Leppo
Ryan P. Steen
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
T: 206.624.0900
E: jeffrey.leppo@stoel.com
E: ryan.steen@stoel.com

Jason T. Morgan
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
T: 206.386.7527
E: Jason.Morgan@stoel.com

Respectfully submitted this 28th day of July, 2015.

*s/ Erik Grafe*

Erik Grafe
EARTHJUSTICE

Pursuant to Federal Rule of Appellate Procedure 8(a) and Ninth Circuit Rule 27-3, Plaintiffs-Appellants Alaska Wilderness League, et al. (Appellants) request this Court enter an injunction pending appeal staying the effectiveness of the incidental take regulation at issue in this action (the take rule) that governs the Arctic Ocean oil and gas drilling activities.[2]

## INTRODUCTION

This action challenges a rule that permits the oil and gas industry to harm, or "take," Pacific walruses incidental to oil and gas exploration in the Chukchi Sea, off the northern coast of Alaska. The take rule was issued pursuant to the Marine Mammal Protection Act (MMPA), under which Pacific walruses are protected. Appellants challenge the rule because it violates the MMPA and the National Environmental Policy Act (NEPA).

On June 30, 2015, the Secretary of the Interior authorized large-scale exploratory drilling by Shell Gulf of Mexico Inc. (Shell) under the take rule. Shell's operations will commence imminently, if they have not already begun. Absent an injunction staying the effect of the rule pending the appeal, those operations are likely to irreparably harm walruses and Appellants' and their members' interests.

[2] All grounds advanced in support hereof were submitted to the District Court.

## BACKGROUND

### I. WALRUSES' CHANGING USE OF THE CHUKCHI SEA HAS INCREASED THEIR VULNERABILITY TO INDUSTRIAL ACTIVITY

The Pacific walrus is uniquely adapted to the sea-ice environment of the shallow continental shelf waters of the Chukchi Sea. Ex. 2 at 8. The largest summer concentration of walruses in U.S. waters—up to tens of thousands—including large numbers of mothers and calves, occurs in and around an offshore area of the Sea called the Hanna Shoal. *Id.* at 8-9. This is also the region in which Shell has been authorized to drill. *See infra* at 14-15.

Walruses historically relied on summer sea ice over this biologically rich area as a resting surface between feeding dives, as well as for avoiding predators, birthing, and nursing. *Id.* at 10, 32; Ex. 25 at 4. Climate change has led to reductions in summer sea ice, causing recent, major shifts in walrus habitat use patterns, and increasing threats to the walrus population. Ex. 2 at 11, 31; Ex. 4 at 49, 65. Walruses continue to use the Hanna Shoal region in large numbers, even during ice-minimum times, but now when often there is no ice over the area, walruses must swim hundreds of kilometers back and forth to the coast to rest between feedings. Ex. 2 at 11, 19, 31-32, 36; Ex. 4 at 35-36, 49-50. This leaves the walrus population acutely and newly vulnerable. Ex. 2 at 31; Ex. 4 at 65. At the same time, decreased summer ice also exposes the walruses to more open-

water oil and gas activities that can disturb and injure them and pose a particular threat to vulnerable mothers and calves. Ex. 4 at 42-43, 48-49; Ex. 2 at 18-19, 32.

# I. THE INCIDENTAL TAKE REGULATION

## A. The Marine Mammal Protection Act

The MMPA prohibits all "taking" of marine mammals, absent an exception. 16 U.S.C. § 1371. One exception provides for the Secretary to authorize the "incidental . . . taking" of "small numbers" of marine mammals by citizens engaging in a "specified activity . . . within a specified geographical region." *Id.* § 1371(a)(5)(A)(i); *id.* § 1371(a)(5)(D)(i). When sufficient information is available about a category of activities and their impacts, the statute authorizes the Secretary to issue a take rule, lasting up to five years, permitting incidental take from those activities. *Id.* § 1371(a)(5)(A)(i). But the Secretary may issue such a rule only if, "after notice . . . and opportunity for public comment," she "finds," *inter alia*, "that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock." *Id.* § 1371(a)(5)(A)(i)(I).

Agency regulations add another step not found in the statute: persons who wish to operate under such a five-year take rule must seek a "letter of authorization" (LOA) specific to their proposed activities. 50 C.F.R. § 18.27(f). The Service issues LOAs, without providing notice or seeking public comment, if

it determines that the activity will cause a level of incidental take consistent with the finding made in the rule regarding total allowable take. *Id.* § 18.27(f)(1)-(2).

B. <u>The Rule for Oil and Gas Exploration Activities in the Chukchi Sea</u>

On June 12, 2013, the Secretary issued the rule challenged in this case, covering oil and gas exploration in the Chukchi Sea. *See* Ex. 2 at 2 (codified at 50 C.F.R. §§ 18.111-.119).

The Secretary admitted that changes in how walruses use their Chukchi Sea habitat, in light of decreasing ice, and the resulting increase in the potential harm to the population from oil-exploration activities, made compliance with the MMPA's mandate difficult. During the rulemaking, the Secretary observed that "a new pattern of walrus distribution and movements has emerged" in the Chukchi Sea due to the climate-change-induced sea-ice loss, Ex. 4 at 49, and concluded that, in the Hanna Shoal region, "many walruses will likely remain even after the ice melts for foraging purposes," leaving them more exposed than ever before to potentially significant impacts from oil-exploration operations. Ex. 2 at 32; *see also id.* at 9 (noting "large numbers of walruses," "at times reaching numbers of tens of thousands of animals" that "could be encountered" by industry activities in the open waters of the Hanna Shoal area and its travel corridors). As a result of these changes, the Secretary determined that "it is critical to minimize disturbance" to

walruses from oil and gas exploration "during July through September" in the Hanna Shoal region. *Id.* at 9; *see also id.* at 42.

However, the Secretary did not resolve in the rule the conditions necessary to meet MMPA mandates in the Hanna Shoal region. Although the Secretary recited the statutorily-mandated conclusion that total take under the rule would be "negligible," *id.* at 41, she was unable to find that the protections specified in the take rule itself were enough to achieve that standard. Instead, she concluded:

> Additional mitigation measures . . . may be necessary for activities within the [Hanna Shoal area] to minimize potential disturbance and ensure consistency with MMPA mandates that only small numbers of walruses be affected with a negligible impact on the stock.

*Id.* at 9; *see also id.* at 32; *id.* at 36; *id.* at 42. The Secretary also recognized that walruses in travel corridors between the Hanna Shoal region and coastal haulouts may require "close monitoring and additional special mitigation procedures." *Id.* at 32. But the take rule did not specify what those mitigation measures were.

Despite conceding that she did not know what measures were necessary to achieve the "negligible impact" required by law, the Secretary issued the take rule challenged here, and included the Hanna Shoal area. The Secretary elected to defer the identification of the necessary, additional mitigation measures for the Hanna Shoal area, and any assessment of whether mitigation could in fact reduce impacts to meet the MMPA negligible impact and other mandates, until the

agency's later LOA process. *See* 50 C.F.R § 18.118(a)(4)(v). Even so, she explained it was uncertain "whether additional mitigation and monitoring measures could reduce any potential impacts to meet the small numbers and negligible impact standards." Ex. 2 at 9; *see also id.* at 42.

## ARGUMENT

The standard for issuance of an injunction pending appeal is the same as that for a preliminary injunction. *See Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006); *Winter v. Natural Res. Def. Council*, 555. U.S. 7, 20 (2008) (setting forth four-part injunction standard).

### I. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. The Secretary Violated the MMPA Because She Could Not Find That, Under the Regulation, Total Take Would Be Negligible

The MMPA provides that the Secretary may allow harm to marine mammals through a rule only, as relevant here, if she first makes a finding after notice and public comment that the "total . . . taking during each five-year (or less) period concerned will have a negligible impact" on walrus stocks or the species. 16 U.S.C. § 1371(a)(5)(A)(i)(I). The finding can be quantitative or qualitative, but it must be based on "total take" for all activities allowed under the rule.[3] The Secretary violated this requirement.

[3] In this regard, the District Court misconstrued Appellants' argument and rejected it on the incorrect premise that they were seeking a numerical finding of total take. *See* Ex. 15 at 18.

To be sure, the Secretary purported to make an overall finding that incidental take from exploration activities under the take rule would have a negligible impact. *Supra* at 5. But she concurrently concluded that she did not know whether mitigation prescribed by the rule would ensure only negligible impacts if activities occur in the Hanna Shoal area. *Supra* at 6. The rule, however, covered the Hanna Shoal area. *Supra* at 5. The Secretary's negligible impact finding was therefore necessarily contingent on later identification, during the LOA process, of mitigation measures and on her assessment during that later process of whether the additional measures would ensure negligible impact. *Supra* at 5-6. The Secretary's decision—to promulgate the take rule without knowing that the total take will be negligible, based on an intention to make it true later—violates the MMPA.

The Secretary's reading of the MMPA underlying her decision does not survive *Chevron*'s familiar analysis. *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Under the first step of that analysis, the Court must attempt to "give[] effect" to Congressional intent discerned using "traditional tools of statutory construction." *Id*. at 843 n.9. When "the intent of Congress is clear, that is the end of the matter." *Id*. at 842.

The MMPA makes Congress's intent explicit: the Secretary may promulgate a five-year take rule, such as the one challenged here, *only* "if [she],

after notice . . . and opportunity for public comment [ ] finds that the total of such taking during each five year (or less) period concerned will have a negligible impact." 16 U.S.C. § 1371(a)(5)(A)(i)(I). To make a finding about the impact of the "total take" during the period covered by the take rule, the Secretary must necessarily assess the cumulative impacts of all the potential activities in all geographical areas covered under the rule. Indeed, such a cumulative assessment of "total take" can only be undertaken at the overarching rulemaking stage, because the later LOA process by definition examines only some portion of the overall authorized five-year activity.[4]

Moreover, as a pre-condition to promulgating any regulation, the Secretary must provide "notice . . . and opportunity for public comment," 16 U.S.C. § 1371(a)(5)(A)(i), on the terms of her finding that total take will have no more than a negligible impact. Providing the public with an actual opportunity to comment on the finding necessarily means that the basis for the finding must be resolved and presented at the time of the finding, not at a later time.

The structure of the MMPA reinforces that Congress expected the Secretary to evaluate total take at the time of a five-year take rule, not later. Congress

[4] The Secretary's regulations establishing the LOA process reflect the Secretary's own understanding that the evaluation of negligible impacts must be made when the regulation is promulgated, with the LOA simply serving as a check. Those regulations provide that "[i]ssuance of a [LOA] will be based on a determination that the level of taking will be consistent with the findings made for the total taking allowable under the specific regulations." *See* 50 C.F.R. § 18.27(f)(2).

established a series of predicate requirements for the issuance of take rules—that they be for a specific set of activities, for a specific geographic area, and take only a small number of animals—and conditioned their issuance on additional very specific steps to be taken only after public comment: a negligible impact finding and the specification of means to minimize take. 16 U.S.C. § 1371(a)(5)(A)(i). Congress did not establish a later process for the Secretary to satisfy any of these essential requirements after the promulgation of rules, when more information might be developed about the regulated activities. On the contrary, in enacting the take rule provision, Congress made clear that these requirements are fundamental: "[u]nless a particular activity takes only small numbers of marine mammals, and that taking has a negligible impact on the species, the new provisions [allowing a take rule] are not applicable to the activity." H.R. Rep. No. 97-228, at 19(1981), *reprinted in* 1981 U.S.C.C.A.N. 1458, 1469. Moreover, where uncertainty about how to meet these requirements for a broad class of activities precludes the use of a five-year rule, Congress established a separate incidental harassment authorization process, which allows for tailoring approval to the particulars of a specific activity over a single season. 16 U.S.C. § 1371(a)(5)(D)(i). This separate process, subject to public notice and comment, emphasizes Congress's intent that five-year take rules be limited to circumstances where the necessary requirements could be met when the rule is promulgated.

The Secretary's take rule violates the MMPA's clear language, structure, and purpose. First, it contravenes the MMPA because it covers activities in the Hanna Shoal area, even though the Secretary acknowledged those activities might, depending on her later determinations, cause more than a negligible impact and require further, not-yet-identified-or-evaluated mitigation. In effect, the rule postponed the Secretary's compliance with the MMPA's negligible impact finding requirement to the non-public LOA process. Taken to its logical conclusion, the Secretary's approach would allow her to issue a regulation that made a "negligible impact" finding based *entirely* on a stated intention to evaluate total take and necessary mitigation later, during a LOA process. The MMPA, however, plainly requires a finding that total take will have a negligible impact as a precedent to promulgating a five-year rule; it does not permit a contingent or deferred finding. Moreover, the Secretary denied the public an opportunity to comment on the basis of the finding before promulgating the rule, as required by the MMPA, because she deferred her conclusions as to the activities in the Hanna Shoal area until the LOA process. And even if it were lawful to defer her finding, the LOA process includes no public notice and comment. Further, even if deferral to a later, non-public process were allowed, the LOA cannot provide the required negligible impact finding based on "total take." In the LOA process the Service is only looking to see if a specific activity is "consistent" with the "total take" previously allowed by

the take rule, not making a cumulative assessment of "total take" over the five-year course of the rule. 50 C.F.R. § 18.27(f); *see supra* at 8. For all these reasons, the take rule violates the plain requirements of the MMPA.

B. The Service's Finding of No Significant Impact Under NEPA Was Unlawful

The Service's attempt to justify its failure to prepare an environmental impact statement (EIS) for the take rule based on a "mitigated FONSI," *see* Ex. 14 at 2, violates NEPA because the Environmental Assessment (EA) did not identify and evaluate the mitigation measures necessary to ensure that impacts from oil-exploration activities in the Hanna Shoal area would not exceed the threshold for significance under NEPA. NEPA allows an agency to avoid preparing an EIS through a mitigated FONSI only if it has shown that "mitigation measures will render . . . impacts [of the project] so minor as to not warrant an EIS." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001). But to make such a showing, an agency must, in its EA, identify, describe, and evaluate the effectiveness of mitigation measures necessary to assure no significant impacts. It cannot base its mitigated FONSI on "a perfunctory description, or mere listing of mitigation measures, without supporting analytical data," *id.* (internal quotation marks and citations omitted), or a promise to consider and determine necessary, but as-yet unidentified, mitigation measures in the future, *see Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 828 (9th Cir. 2008), *withdrawn and vacated*,

559 F.3d 916 (9th Cir. 2009), *and dismissed as moot sub nom. Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009).

The Service's EA fails these most basic requirements for justifying a mitigated FONSI: the EA admits that "additional," Hanna Shoal-specific mitigation measures may be necessary to prevent significant impacts, but then impermissibly defers identifying, evaluating, and adopting those necessary measures to the later, non-public LOA process. *See* Ex. 4 at 27-28. And the EA's non-exclusive list of general categories of mitigation the Service might apply—"seasonal restrictions, reduced vessel traffic, or rerouting vessels," *id.* at 27—falls short of even the "mere listing of mitigation measures, without supporting analytic data" that is insufficient to support a mitigated FONSI. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734. The Service's "decision to act now and deal with the environmental consequences later" violates established Circuit precedent and "is plainly inconsistent with the broad mandate of NEPA." *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1181 (9th Cir. 1982).

## II. ABSENT AN INJUNCTION, APPELLANTS WILL SUFFER IRREPARABLE HARM

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Here, Shell plans to begin drilling exploratory oil wells into Burger Prospect in the

Hanna Shoal region imminently and, if allowed to proceed, likely would cause irrevocable harm to the already weakened Pacific walrus population and to Appellants' interests.[5] In a declaration submitted with this motion, *see* Exhibit 17, Dr. Timothy Ragen, former Executive Director of the U.S. Marine Mammal Commission and an Arctic pinniped expert, has explained that the industrial footprint and loud noises of the large-scale drilling operations will likely displace large numbers of walruses from important feeding habitat in the Burger Prospect area, and such displacement will likely result in reduced survival and reproductive success, especially for the most vulnerable females with young, causing likely durable, population-level impacts.

Climate change-induced receding sea-ice cover has opened up the Chukchi Sea's summer waters to oil exploration, put exploration in closer proximity to walruses, and caused walruses to become stressed in novel ways that heighten their vulnerability to industrial disturbance. *See supra* at 2-3. The rapid loss of summer and fall sea ice has caused a 50 percent or more decline of the Pacific walrus population since the late 1990s. Ex. 17 at 3-4, ¶¶ 3, 4. Walruses use sea ice as a

---

[5] Appellants' members make regular trips to experience, guide business clients to view, consult others on, study, write scholarship on the topic of, fight to protect, hunt for subsistence, recreate alongside, observe, and enjoy Pacific walruses in the Chukchi Sea and along its coastline. *See, e.g.*, Ex. 8 at 7-8, ¶¶ 18-24; Ex. 9 at 6-7, ¶ 15; Ex. 10 at 2, 6, ¶¶ 1, 2, 5, 20; Ex. 11at 4-6, 8, ¶¶ 10-12, 18; Ex. 12 at 1, 5 ¶¶ 3, 13. Activities that harm the walrus population would cause irreparable injury to Appellants' members.

platform for all major life functions, *see supra* at 2, and the disappearance of summer sea ice has limited walruses' access to foraging habitat by forcing walruses to congregate on shore rather than on ice platforms near their prime feeding grounds. Walruses often now must "commute" long distances in order to feed. Ex. 17 at 5-7, ¶¶ 6-8; *see also* Ex. 25 at 13-14. Upon arrival at their feeding grounds, walruses are in weakened condition without anywhere to rest; any additional stress to these beleaguered animals in these key areas is likely to reduce their ability to reproduce and survive. Ex. 17 at 6-7, 10-12, ¶¶ 7-8, 14-15. The Service itself has recognized that walruses now warrant protection under the Endangered Species Act, although it has not listed the species yet, due to other priorities. Ex. 25 at 1, 13-14, 39-41.

The challenged rule, and subsequent LOA, authorize Shell to operate in the Hanna Shoal region at the Burger Prospect, which is important walrus habitat. Ex. 18 at 16; Ex. 17 at 7-8, ¶¶ 9-11. The most significant summer concentration of walruses in U.S. waters occurs in and around the Hanna Shoal, which has "long been recognized as a critical foraging area for the Pacific walrus in summer and fall" (June to October), with the numbers of foraging walruses sometimes totaling in the tens of thousands. Ex. 2 at 8-9. Walruses, including mothers and calves, travel to the shallow waters in the Hanna Shoal region to feed on clams and other ocean-bottom organisms. *Id.* at 8-9, 12-13. The Burger Prospect and Hanna Shoal

are contiguous parts of the same shallow underwater feature, and the Burger Prospect is an area of demonstrated importance to feeding walruses. Ex. 17 at 7-8, ¶¶ 10-11. Thousands of walruses are likely to be feeding at the Burger Prospect during summer and fall. *Id.* at 7-8, ¶ 10; *see also* Ex. 18 at 11 ("[o]ccurrences of walruses in the area of Shell's Burger Prospect are regular and common."); *id*. at 12 (noting more than ten thousand walruses observed in the Burger Prospect during Shell's 2012 drilling activities).

The Service issued, on June 30, 2015, a LOA which precludes activity that could cause walrus take in July, August, and September in only a portion of the Hanna Shoal region—the area that is estimated to contain 50 percent of the walruses based on prior survey data for each month. Ex. 16 at 7,¶ 9. This authorization, therefore, permits activity over most of the Hanna Shoal region, including the Burger Prospect, as well as in the travel corridors from shore to these feeding areas, exposing a significant portion of the population to serious displacement impacts.[6] Ex. 17 at 12-16, ¶¶ 16-18; *See also* Ex. 18 at 18-19.

Shell's planned drilling is a large industrial undertaking. It includes two large drilling vessels, Ex. 19 at 20-21, accompanied by ice-breakers, anchor

[6] Moreover, even walruses outside of the immediate Burger prospect area, including those in transit, could be substantially affected by operations miles away. *See* Ex. 18 at 19 and Ex. 21 at 6 (stating walruses react to icebreaking at distances of up to 20-25 kilometers and move to areas where sound levels are only slightly above ambient sound); Ex. 1 at 12, Ex. 18 at 19, and Ex. 19 at 28 (describing that ice breaking itself occurs at significant distances from the drilling sites).

handling vessels, tugs, barges, other support vessels, helicopters, and other aircraft operating over a large area, *id.* at 21-32; Ex. 26 at 2-4; Ex. 27 at 2-3. These activities would introduce harmful noise and industrial disturbance into the environment. *See* Ex. 26 at 7-27; Ex. 27 at 15. Shell seeks to drill between July and October 2015, the same timeframe during which walruses use the area in large numbers. Ex. 19 at 18; Ex. 18 at 12.

Shell's drilling operations likely will displace thousands of walruses from their key foraging areas at and near the planned operations. Ex. 17 at 12-14, ¶¶ 16-17. As the Department of the Interior has acknowledged, industrial noise and disturbance from drilling, vessel traffic, ice-breaking, helicopters, and seismic surveying can cause walruses to abandon preferred feeding areas, separate mothers from calves, and result in increased stress and energy expenditures. *See* Ex. 20 at 7; Ex. 18 at 18, 20. Data collected by Shell during its limited 2012 drilling season confirm that Shell's planned drilling operations will displace and harm walruses. Those data, which underrepresent the number of walruses present in the area and affected by Shell's operations, *see* Ex. 17 at 7-8, ¶ 10, show that the company's 2012 operations displaced thousands of walruses, one third of the total observed, *id.* at 12-13, ¶ 16. Shell's operations this year could be much larger than in 2012. *See id.* at 13, ¶ 17.

Displaced walruses will expend energy moving to other habitat, be at greater risk of depleting the prey resources in that habitat, and will more likely face competition for those prey resources. *Id.* at 13-14, ¶ 17. For walruses, such displacement is tantamount to loss of habitat and compounds the effects of climate change on them. *Id.*; *see also* Ex. 18 at 20 ("Increases in physiological stress of adults or juveniles may reduce fitness and have implications for productivity and survivorship over time."); Ex. 20 at 12 (females with dependent young are the "least tolerant" of disturbances); Ex. 18 at 14, 20.

The combined effects of this displacement likely will cause a population-level decline in the already declining walrus stock. Ex. 17 at 13-14, ¶ 17. Because walruses are already losing access to suitable foraging habitat due to climate change and diminished seasonal sea ice, those walruses displaced from their foraging grounds by Shell's operations likely will not be able to make up the missed feeding opportunities elsewhere. *Id*. This loss of feeding opportunities, in turn, will likely make the displaced walruses more vulnerable to reduced survival and reproduction, leading to population decline. *Id*. at 10, 13-14, ¶¶ 14, 17. The walrus population likely would take years to recover from the negative effects of drilling this year. *Id*. at 13-14, ¶ 17.

This sort of likely, long-term harm to the walrus population affects the interests of Appellants and their members, and supports issuance of an injunction

pending appeal. This is particularly the case for a species protected by the MMPA, for which Congress has generally prohibited all take—including both physical injury and behavioral harassment, 16 U.S.C. § 1362(13), (18)—and even the exceptions prohibit more than negligible impacts on a population, *id.* § 1371(a)(5)(A)(i).[7] *See, e.g.*, *Natural Res. Def. Council v. Evans*, 279 F. Supp. 2d 1129, 1188 (N.D. Cal. 2003) (harassment of marine mammals affecting essential feeding and other behaviors is the type of harm justifying an injunction in light of purposes of MMPA); *cf. Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064-66, 1067 (9th Cir. 1996) (citing Congressional intent and the underlying statute in support of finding that harm in form of habitat loss affecting essential wildlife behavior patterns justifies injunction).

## III. THE BALANCE OF EQUITIES FAVORS APPELLANTS

"[W]hen environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (internal quotation

---

[7] Plaintiffs seek relief here based on displacement and loss of habitat for thousands of walruses, leading to irreparable impacts expressed at the population level, not based on harm to individual walruses. Thus, the separate question of whether in some circumstances harm to individual animals may justify injunctive relief is not before this Court. *Compare Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007 WL 2220256, at *16 (W.D. Wash. Aug. 1, 2007) (harm to individuals of a protected species is irreparable), *with Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (harm to individuals of a protected species is irreparable only when "significant" to the "overall population").

marks omitted). That is the case here. The drilling activities authorized by the take rule will likely irreparably harm walrus populations and, thus, the aesthetic, recreational, economic, and other interests of Appellants' members who depend upon the health of those populations.

There are no unusual circumstances that might excuse the need to preserve the status quo and prevent such harm. The Secretary will suffer no harm if an injunction is granted and Shell would incur only the economic harm of delaying its exploration plan for a length of time if an injunction is granted—unless, of course, Appellants prevail on the merits on appeal, in which case take from Shell's exploration plan should not have been authorized in the first place. Appellants initiated this action within weeks of Shell's application under the regulation, when they knew for the first time that major exploration drilling activities would be attempted under it. Any economic harm incurred by Shell, particularly since it made "significant financial commitments" during the pendency of this case and "before knowing for sure" whether it would be issued the necessary permits, Ex. 22 at 4, ¶ 10, should not outweigh the likely irreparable harm to the environment that could be caused by the exploration activities. *See League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765-66 (9th Cir. 2014) (holding economic harm of temporary delay does not outweigh the permanent harms to the environment); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir.

2013) (parties are "largely responsible for their own harm" when they "anticipate[] a pro forma result in permitting applications"); *see also Alaska Wilderness League*, 548 F.3d at 821 (noting stay was granted in challenge to an exploration plan for offshore drilling by Shell in the Arctic); *Idaho Sporting Cong.*, 222 F.3d at 569; *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 738.

## IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION

In enacting the MMPA, Congress found that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic" and "should be protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(6). Similarly, NEPA aims to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. An injunction that prevents harmful activities approved in violation of the MMPA and NEPA furthers the statutes' purposes and thereby protects the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 737.

Respectfully submitted this 28th day of July, 2015.

| | |
|---|---|
| *s/ Erik Grafe* | *s/ Nathaniel S.W. Lawrence* |
| Erik Grafe<br>EARTHJUSTICE<br>*Attorneys for Plaintiffs-Appellants Alaska Wilderness League, et al.* | Nathaniel S.W. Lawrence<br>NATURAL RESOURCES DEFENSE COUNCIL<br>*Attorneys for Plaintiff-Appellant Natural Resources Defense Council* |

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2015, I electronically filed the foregoing APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3, with attachments, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 28th day of July, 2015.

*s/ Erik Grafe*
Erik Grafe
EARTHJUSTICE

## TABLE OF EXHIBITS

*Alaska Wilderness League, et al. v. Sally Jewell, et al.*
No. 15-35559

| Exhibit No. | District Ct. Doc. | Description | AR No. |
|---|---|---|---|
| 1 | 10-6 | Shell Gulf of Mexico Inc., Requests for Letter of Authorization (LOA) for the Incidental Take of Polar Bears and Pacific Walrus, and the Intentional Take of Polar Bears and Walrus by Harassment; Exploration Drilling Program, Chukchi Sea, Alaska (Sept. 16, 2014) (excerpts) | - |
| 2 | 47-1 | U.S. Fish and Wildlife Service, Marine Mammals; Incidental Take During Specified Activities; Final Rule, 78 Fed. Reg. 35,364 (June 12, 2013) | ARITR00053867-ARITR00053931 |
| 3 | 47-2 | U.S. Fish and Wildlife Service, Finding of No Significant Impact, Procedural Regulations Governing the Incidental Taking of Marine Mammals by Harassment (May 16, 2013) | ARITR00051267-ARITR00051269 |
| 4 | 47-3 | U.S. Fish and Wildlife Service, Final Environmental Assessment, Final Rule to Authorize the Incidental Take of Small Numbers of Pacific Walruses (*Odobenus rosmarus divergens*) and Polar Bears (*Ursus maritimus*) During Oil and Gas Industry Exploration Activities in the Chukchi Sea (May 14, 2013) (excerpts) | ARITR00048167-ARITR00048368 |

| Exhibit No. | District Ct. Doc. | Description | AR No. |
|---|---|---|---|
| 5 | 47-25 | Declaration of Cindy Shogan | - |
| 6 | 47-26 | Declaration of Rebecca Noblin | - |
| 7 | 47-27 | Declaration of John Hamlin Deans | - |
| 8 | 47-29 | Declaration of Dan Ritzman | - |
| 9 | 47-30 | Declaration of Robert Thompson | - |
| 10 | 47-31 | Declaration of Earl Kingik | - |
| 11 | 47-32 | Declaration of Richard G. Steiner | - |
| 12 | 47-33 | Declaration of Michael Wald | - |
| 13 | 48-1 | Declaration of Andrew Wetzler | - |
| 14 | 55 | Federal Defendants' Principal Summary Judgment Brief (June 17, 2015) (excerpts) | - |
| 15 | 59 | Order Re Cross-Motions for Summary Judgment (July 2, 2015) | - |
| 16 | 63-1 | U.S. Fish and Wildlife Service, Letter of Authorization, Incidental Take (15-CS-02) (June 30, 2015) | - |
| 17 | 63-2 | Declaration of Timothy J. Ragen (July 7, 2015) | - |

| Exhibit No. | District Ct. Doc. | Description | AR No. |
|---|---|---|---|
| 18 | 63-3 | Bureau of Ocean Energy Management, Shell Gulf of Mexico, Inc. Revised Outer Continental Shelf Lease Exploration Plan, Chukchi Sea, Alaska, Burger Prospect: Posey Area Blocks 6714, 6762, 6764, 6812, 6912, 6915 Revision 2 (March 2015), Environmental Assessment, OCS EIS/EA BOEM 2015-020 (May 2015) (excerpts) | - |
| 19 | 63-4 | Shell Gulf of Mexico Inc., Exploration Plan, App. C, Environmental Impact Analysis, Revision 2, Chukchi Sea, Alaska, Burger Prospect: Posey Area Blocks 6714, 6762, 6764, 6812, 6912, 6915, Chukchi Sea Lease Sale 193 (Mar. 2015) (excerpts) | - |
| 20 | 63-5 | Minerals Management Service, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, Final Environmental Impact Statement, Vol. I, OCS EIS/EA MMS 2007-026 (May 2007) (excerpts) | ARITR00000932-ARITR00001562 |
| 21 | 63-6 | Bureau of Ocean Energy Management, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Final Second Supplemental Environmental Impact Statement, Vol. 1, OCS EIS/EA BOEM 2014-669 (Feb. 2015) (excerpts) | - |

| Exhibit No. | District Ct. Doc. | Description | AR No. |
|---|---|---|---|
| 22 | 74 | Declaration of Dale Snyder (July 20, 2015) | - |
| 23 | 79 | Order Denying Motion for Injunction Pending Appeal (July 23, 2015) | - |
| 24 | - | U.S. District Court, District of Alaska (Anchorage), Civil Docket for Case No. 3:15−cv−00067−SLG (as of July 26, 2015) | - |
| 25 | - | U.S. Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List the Pacific Walrus as Endangered or Threatened; Notice of 12-Month Petition Finding, 76 Fed. Reg. 7,634 (Feb. 10, 2011) | - |
| 26 | - | National Marine Fisheries Service, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to an Exploration Drilling Program in the Chukchi Sea, Alaska; Notice of Proposed Incidental Harassment Authorization, 80 Fed. Reg. 11,726 (Mar. 4, 2015) | - |

| Exhibit No. | District Ct. Doc. | Description | AR No. |
| --- | --- | --- | --- |
| 27 | - | National Marine Fisheries Service, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to an Exploration Drilling Program in the Chukchi Sea, Alaska; Notice of Issuance of an Incidental Harassment Authorization, 80 Fed. Reg. 35,744 (June 22, 2015) | - |