No. 15-35559

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**ALASKA WILDERNESS LEAGUE, ET AL.,**
*Plaintiffs-Appellants*,
*v.*

**S.M.R. JEWELL, SECRETARY OF THE DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE,**
*Federal Defendants-Appellees*,
and

**ALASKA OIL AND GAS ASSOCIATION,**
*Defendant-Intervenor-Appellee.*

Appeal from the U.S. District Court
for the District of Alaska, No. 3:15-cv-67-SLG

# FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL


JOHN C. CRUDEN
Assistant Attorney General

JENNIFER S. NEUMANN
MEREDITH FLAX
DAVID B. GLAZER
THEKLA HANSEN-YOUNG
Attorneys, U.S. Dep't of Justice
Env't & Natural Resources Div.
P.O. Box 7415 (Ben Franklin Station)
Washington, DC 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

*Of counsel:*
KENNETH M. LORD
Office of the Solicitor
Dep't of the Interior
Anchorage, Alaska

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND........................................................................................................2

ARGUMENT ...........................................................................................................8

I. The League is not likely to succeed on its Marine Mammal Act claim; nor can it demonstrate serious questions on the merits. ..........................................................9

A. The Service considered all relevant information before finding that the non-lethal take in the regulations would negligibly impact walrus. ...............................10

B. The Service thoroughly detailed all mitigation measures, but could not explain in more detail some of the additional mitigation measures it might apply in the Hanna Shoal Walrus Use Area because those additional measures are meant to be tailored to current information. ..........................................................................13

C. The Marine Mammal Act's notice and comment requirement was served here because the Service provided enough detail to enable extensive comment and incorporated that information in the final regulations. .........................................18

II. The League has not demonstrated a likelihood of success or any serious questions on its NEPA claim.........................................................................................20

III. The League has not shown irreparable harm, and both the balance of equities and the public interest weigh heavily against an injunction here. ........................23

CONCLUSION .......................................................................................................26

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES:**


*Alaska Wilderness League v. Jewell*,
9th Cir. No. 15-71656 .......... 5

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 9

*Apache Survival Coal. v. United States*,
21 F.3d 895 (9th Cir. 1994) .......... 5

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) .......... 18

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) .......... 10, 17, 18, 22

*Ctr. for Biological Diversity v. Kempthorne*,
3:07-cv-00141-RRB (D. Alaska) .......... 17

*Ctr. for Biological Diversity v. Salazar*,
No. 3:08-cv-159-RRB (D. Alaska Jan. 8, 2010) .......... 4

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) .......... 2, 4

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .......... 23

*Envtl. Prot. Info. Ctr. v. United States*,
451 F.3d 1005 (9th Cir. 2006) .......... 22

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 10

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) .......... 9

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 26

*Native Village of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) .......... 5

*Natural Res. Def. Council v. EPA*,
863 F.2d 1420 (9th Cir. 1988) .......... 19

*Pac. Coast Fed'n of Fishermen's Assocs. v. Blank*,
693 F.3d 1084 (9th Cir. 2012) .......... 17

*Theodore Roosevelt Conserv. P'ship v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) .......... 17

*Tillamook Cnty. v. U.S. Army Corps of Eng'rs*,
288 F.3d 1140 (9th Cir. 2002) .......... 16

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) .......... 26

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
222 F.3d 1105 (9th Cir. 1999) .......... 22

*Winter v. Natural Res. Def. Council*
555 U.S. 7 (2008) .......... 8, 23

**STATUTES:**

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) .......... 9

Marine Mammal Protection Act ("Marine Mammal Act")
16 U.S.C. § 1362(1) .......... 2
16 U.S.C. § 1371(a) .......... 2
16 U.S.C. § 1371(a)(5)(A)(i) .......... 2, 3, 19, 20
16 U.S.C. § 1371(a)(5)(A)(i)(I) .......... 3, 9
16 U.S.C. § 1371(a)(5)(A)(i)(II) .......... 3, 18

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C) ........................ 6

Outer Continental Shelf Lands Act, 43 U.S.C. § 1332(3) ................................................ 26

**RULES, REGULATIONS, and OTHER:**

43 C.F.R. § 1501.3 ........................................................................................ 6
43 C.F.R. § 1508.9(a)-(b)................................................................................ 6

50 C.F.R. § 18.27........................................................................................... 3
50 C.F.R. § 18.27(b)....................................................................................... 3
50 C.F.R. § 18.27(c) ................................................................................. 3, 10
50 C.F.R. § 18.27(d)(3) .................................................................................. 3
50 C.F.R. § 18.27(e) ....................................................................................... 3
50 C.F.R. § 18.27(f) ........................................................................................ 3
50 C.F.R. § 18.27(f)(3).................................................................................. 17
50 C.F.R. § 18.27(f)(4)............................................................................. 14, 17
50 C.F.R. § 18.27(f)(5) .............................................................................. 7, 17

50 C.F.R. § 18.114-118.................................................................................... 7
50 C.F.R. § 18.116 .................................................................................... 7, 10
50 C.F.R. § 18.117 .......................................................................................... 7
50 C.F.R. § 18.118 .......................................................................................... 7
50 C.F.R. § 18.118(a).................................................................................. 6, 14
50 C.F.R. § 18.118(a)(4)(v) ....................................................................... 15, 21

73 Fed. Reg. 33,212 (June 11, 2008) ............................................................... 4
76 Fed. Reg. 3843 (Jan. 21, 2011) ................................................................. 22

H.R. Rep. No. 95-590 (1977), *reprinted* in 1978 U.S.C.C.A.N. 1450 .............................. 26

## INTRODUCTION

The plaintiffs ("League") ask this Court to enjoin pending appeal the U.S. Fish and Wildlife Service's ("Service") 2013 regulations for the non-lethal, incidental take of small numbers of Pacific walruses during oil and gas exploration activities in the Chukchi Sea and adjacent Alaskan coasts between 2013 and 2018. Before any take is authorized, however, the Service requires a permit, called a Letter of Authorization ("LOA"), for each activity to ensure it will have only a negligible impact on walrus and result in take of only small numbers of walruses. The regulations include mitigation measures that apply to all LOAs and allow the Service to require additional mitigation measures where current information demonstrates it will be beneficial.

The League brings two Administrative Procedure Act ("APA") claims asserting that the regulations violate the Marine Mammal Protection Act ("MMPA" or "Marine Mammal Act") and the National Environmental Policy Act ("NEPA"). Its claims boil down to its assertion that the Service did not sufficiently specify in the regulations all possible mitigation measures that might be included in future LOAs for exploration activities in the Hanna Shoal Walrus Use Area, a region of the Chukchi Sea where many walruses forage in the summer. The district court rejected these claims, granting summary judgment for the Service on July 2, 2015. After waiting more than a year and a half to challenge the regulations, and more than two years before seeking to enjoin them, the League asks the Court to enjoin the regulations, as well as an LOA issued on June 30, 2015 to Shell Gulf of Mexico that the League did not challenge below.

The motion should be denied because the League is not likely to succeed on the merits of its claims, has not shown irreparable harm, and the balance of the equities and the public interest do not favor an injunction. In the more than twenty years since the Service first issued incidental take regulations covering oil and gas exploration in the Chukchi and Beaufort Seas, there have been no known walrus deaths or serious injuries. Impacts have been temporary and insignificant. This is because the Service carefully considered potential impacts and required copious mitigation and monitoring measures in the regulations to ensure any impact is minor, and, through individual LOAs, considers current information and imposes additional mitigation to ensure any take that occurs is consistent with the regulations. This Court affirmed the Service's incidental take regulations that preceded those at issue here. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012). The League presents no reason for the Court to rule differently on these more protective regulations.

## BACKGROUND

The Marine Mammal Act prohibits "take"—meaning harassment, hunting, capturing, or killing—of marine mammals, with some exceptions. 16 U.S.C. §§ 1362(13), 1371(a). As relevant here, under 16 U.S.C. § 1371(a)(5)(A)(i), the public can ask the Service to issue five-year regulations permitting the "incidental, but not intentional" take of small numbers of marine mammals that may occur when engaging in otherwise legal oil and gas exploration. The Service "shall allow" the requested take

if, among other things, it determines that the total take during the five years will have a "negligible impact" on the species. *Id.* § 1371(a)(5)(A)(i)(I); 50 C.F.R. § 18.27(c).

Under regulations implementing 16 U.S.C. § 1371(a)(5), the Service uses a two-step process for authorizing incidental take that enables it to tailor its mitigation measures to individual applications and better protect marine mammals. 50 C.F.R. § 18.27. The Service first issues incidental take regulations for the class of requested activities, based on the best available scientific information. 50 C.F.R. § 18.27(d)(3), (e). The regulations must identify the permissible methods of take and "other means of effecting the least practicable adverse impact" on the species, and requirements for monitoring and reporting. 16 U.S.C. § 1371(a)(5)(A)(i)(II); 50 C.F.R. § 18.27(b). Applicants must then apply for and obtain LOAs, which permit incidental taking for a specific activity. *Id.* § 18.27(f). For an LOA to be issued, the Service must confirm that any take will have a negligible impact and is consistent with the regulatory findings for the total allowable take over the five-year period. *Id.* This two-step process enables the Service to customize each LOA and impose additional mitigation measures to address the precise location and nature of the proposed activity based on current information.

Since 1992, the Service has used this process to issue incidental take regulations and LOAs covering oil and gas exploration activities in Pacific walrus habitat in the Chukchi and Beaufort Seas. ER279.[1] Walruses range across these seas. Their

---

[1] For some portion of this time, the Service issued one-year Individual Harassment Authorizations for the Chukchi Sea instead of the five-year incidental take regulations,

distribution varies with the season and is closely associated with the presence of pack ice, on which they "haul out" for resting, breeding, and care of young. ER286; ER283–84; ER288; ER107; ER112. They forage on things like clams and worms, found on the sea floor. ER115. Walruses are distributed widely across the shallow continental shelf waters of the Chukchi Sea and large numbers forage near Hanna Shoal in the summer. ER284–85; ER149; ER253. The Service has delineated the Hanna Shoal Walrus Use Area, a core area in the Hanna Shoal region that walruses regularly use, ER99–102, ER254, where, as explained, *infra*, it may seasonally restrict activity, such as seismic or drilling operations, and reroute vessels and aircraft to avoid walrus travel corridors when close monitoring demonstrates a need, ER149, ER250.

In 2008, the Service promulgated five-year incidental take regulations, which covered oil and gas exploration activities in the Chukchi Sea through 2013. 73 Fed. Reg. 33,212 (June 11, 2008). These regulations included numerous mitigation and monitoring measures to protect walruses. The 2008 regulations were affirmed by both the district court and this Court. *Ctr. for Biological Diversity v. Salazar*, No. 3:08-cv-159-RRB, ECF58 (D. Alaska Jan. 8, 2010) (ER369–74), *aff'd* 695 F.3d at 917. During the period when these and prior incidental take regulations were in effect, there were no known walrus deaths or serious injuries and impacts were negligible. ER306; ER193.

---

but found that the Individual Harassment Authorization process did "not provide the comprehensive evaluation necessary to understand all potential impacts from the various onshore and offshore Industry activities that may affect walruses." ER275.

The Alaska Oil and Gas Association ("Association"), which intervened in this suit, petitioned the Service on January 31, 2012, for another set of regulations allowing the non-lethal, incidental take of small numbers of walruses and polar bears during oil and gas exploration activities in the Chukchi Sea and Alaska's western coast from June 11, 2013, to June 11, 2018. ER1–6. These activities were approved by other federal agencies in Lease Sale 193.[2] As relevant here, Lease Sale 193 requires that all activities incorporate mitigation measures for walruses, which were outlined in the Lease Stipulations. ER193–96; ER343; ER345; ER7–15.

The Service evaluated the petition, including the level of industry activities and potential impacts on walruses. On January 9, 2013, the Service issued proposed incidental take regulations for public comment. ER23–71. The proposed regulations included mandatory mitigation measures that apply to all LOAs, such as seasonal operating restrictions and vessel and aircraft use restrictions. ER40–42; ER50–51. The proposed regulations also reserved the Service's ability to require additional measures in LOAs, particularly for LOAs covering the Hanna Shoal Walrus Use Area. ER53.

The same day it issued the proposed regulations, the Service also issued a draft Environmental Assessment ("EA") for public comment, ER24, ER16–23, in

[2] This Court remanded Lease Sale 193 to the Bureau of Ocean Energy Management for reconsideration of its reliance on a one billion barrel estimate of total economically recoverable oil. *Native Village of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014). The case is still pending. *See* D. Alaska No. 08-cv-4, June 17, 2015 order. There is also a pending petition for review challenging the Bureau's approval of Shell's exploration plan under Lease Sale 193. *See Alaska Wilderness League v. Jewell*, 9th Cir. No. 15-71656.

compliance with NEPA, which requires federal agencies to analyze and disclose environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EA is a "concise public document" that, among other things, "[s]hall include brief discussions" of the proposal's environmental impacts and alternatives. 43 C.F.R. § 1508.9(a)–(b).

The Service issued a final EA on May 14, 2013. ER72–273. The EA described a robust suite of mitigation and monitoring measures, including those required under the Lease Sale 193 Stipulations and those required by the proposed regulations. 50 C.F.R. § 18.118(a); ER196–213; ER100–02. Based on its long experience with these measures, the Service found that the class of activities authorized by the incidental take regulations, as mitigated, would have only a negligible impact on the walrus population and that only small numbers of animals would be taken. ER213; ER101–02. The Service also concluded that the regulations would have no significant environmental impacts and, accordingly, an environmental impact statement was unnecessary. ER276; ER213; 42 U.S.C. § 4332(2)(C); 43 C.F.R. §§ 1501.3. The agency issued a Finding of No Significant Impact ("FONSI") on May 16, 2013. ER274–76.

On June 12, 2013, the Service issued incidental take regulations covering offshore oil and gas exploration activities in the 92,644 square mile Chukchi Sea region. ER277–341; ER280; ER252. The regulations identify allowable ways of non-lethal take for industry activities, impose extensive mitigation measures to ensure activities no more than negligibly impact the Pacific walrus, and require exhaustive

monitoring and reporting requirements to ensure take levels are not exceeded. ER279; ER313; ER193–212; 50 C.F.R. §§ 18.116, 18.118. With mitigation and monitoring, any take that does occur is expected to amount to normal, minor, short-term behavioral responses, like diving or moving away. ER294–97; ER149; ER151–53; ER157–58. These responses are not likely to affect population recruitment or survival rates, ER297, and will have only a negligible impact on the Pacific walrus. ER317–18. Killing or intentional take is prohibited. ER278; ER327; 50 C.F.R. § 18.117. The Service also discussed the challenges presented by climate change, which make adaptive, responsive mitigation and close monitoring especially important. ER307–08.

Under the regulations, anyone seeking take authorization for a project must apply for an LOA. ER278–79. LOA applicants must submit, among other things, an Operations Plan, a walrus interaction plan, and a site-specific monitoring and mitigation plan to monitor the effects of authorized activities on walruses. ER279–80. LOAs will be granted only if the total level of take by all applicants in a given year is consistent with the negligible impact (and other) findings in the regulations. ER280. LOAs will include mitigation, monitoring, and reporting requirements specific to each activity. ER279–80; ER305; 50 C.F.R. §§ 18.114–118. LOAs can be suspended or withdrawn if information suggests they are having a greater than negligible impact. 50 C.F.R. § 18.27(f)(5); ER332 (Comment 87 response). Since issuing the regulations, the Service has issued several LOAs, ECF54, including one on June 30, 2015, to Shell, a member of the Association. Mot. Ex. 16 (ECF63-1). Shell is currently exploring in the

Burger prospect, so no drilling will occur in the Hanna Shoal Walrus Use Area. Mot. Ex. 18 at 16–21 (ECF63-3); Mot. Ex. 1 at 10; Mot. Ex. 16 at 7–8 (ECF63-1).

Almost a year and a half after the regulations were promulgated, in November 2014, the League filed suit in the District Court for the District of Columbia. ECF1. The case was transferred to the District of Alaska on April 29, 2015. ECF26. The parties cross-moved for summary judgment in May and June 2015. The court entered summary judgment on July 2, 2015 for the Service and the Association. ECF59.

On July 7, 2015, the League appealed and, on July 8, 2015, moved in the district court to enjoin the regulations and the Shell LOA, Mot. Ex. 16 (ECF63), even though its suit does not challenge the Shell LOA, a separate agency action with a different administrative record not before any court. The court denied the motion on July 23, 2015, finding that the League had not shown the balance of equities tips in its favor, "and certainly not sharply in [its] favor," when comparing its two year delay in seeking injunctive relief with the harms that would be suffered by Shell. ECF79 at 7. The League now requests that this Court enter an emergency injunction pending appeal.

## ARGUMENT

To obtain the "extraordinary remedy" of an injunction pending appeal, an appellant must establish that: (1) it is likely to succeed on the merits of its appeal, (2) it is likely to suffer irreparable harm in the absence of an injunction during the appeal, (3) the balance of the equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20–24 (2008). This Court has

held that if a party shows irreparable harm, that an injunction is in the public interest, and that the balance of equities "tips sharply" in its favor, an injunction may be proper if there are "serious questions" on the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The League has not met its burden. This Court reviews the League's claims under the APA's deferential arbitrary and capricious standard. 5 U.S.C. § 706(2); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## I. The League is not likely to succeed on its Marine Mammal Act claim; nor can it demonstrate serious questions on the merits.

The Service may issue regulations authorizing non-lethal, incidental take of small numbers of Pacific walruses only if it "find[s] that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(A)(i)(I). The Service made that finding here. ER317–18. The League asserts, at 6–11, that the Service violated this requirement because the regulations' Hanna Shoal provision permits the Service to impose additional mitigation when it issues individual LOAs for that area, and, without specifying that additional mitigation for the Hanna Shoals area in the regulations, the Service could not reasonably conclude that total take under the regulations would have a negligible impact on the walrus population.[3] The League is essentially taking issue with the Service's decades-old incidental take regulation/LOA process, 50 C.F.R. § 18.27,

[3] The League erroneously claims, at 6 n.3, that the court misconstrued its argument. The court rejected its argument because the Service did not need to quantify take *and* its negligible impact finding was reasonable. ECF59 at 16–17, 22. Even so, the League has not shown how the court's interpretation makes it likely to succeed on the merits.

which allows the Service to add mitigation measures to individual LOAs. The flexibility to require additional mitigation for activities in the Hanna Shoal Walrus Use Area is no different than the flexibility the Service always has to add more mitigation based on current information and operating plans, *see, e.g.,* ER336; 50 C.F.R. § 18.116, and the League fails to show how using that process here was arbitrary.

### A. The Service considered all relevant information before finding that the non-lethal take in the regulations would negligibly impact walrus.

The Marine Mammal Act regulations explain that the impact on a species is "negligible" if it "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 18.27(c). This definition "requires the analysis of those effects that are 'reasonably expected' and 'reasonably likely,' but not those effects that are speculative or uncertain." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710–11 (9th Cir. 2009). "A negligible impact finding is arbitrary and capricious under the MMPA only if the agency . . . entirely failed to consider an important aspect of the problem." *Id.* at 710 (*citing Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). The Service considered all relevant information and fully explained its decision that the regulations would have only a negligible impact on the walrus population.

Before issuing the regulations, the Service considered the best scientific information available regarding Pacific walruses, including their distribution (based on ten years of aerial surveys and studies and analysis of pack ice position) and biological

characteristics (through harvest data, biopsy, and radio telemetry). ER94–118; ER317. The Service also considered the nature and level of proposed activities, ER256–67, ER272–73, and potential impacts from noise, physical obstructions, human encounters, and oil spills, ER317; ER84; ER143–58. It also considered the documented impacts of industry activities on walruses and cumulative effects of those activities, ER145–58, ER178–79, ER186–93, the potential impacts of climate change and resulting habitat displacement, ER181–86, mitigation and monitoring that would be implemented under LOAs, ER193–212, numerous studies, ER220–44, and other monitoring data, ER317, ER267–71. It also consulted with nineteen environmental organizations, almost fifty native communities and corporations, five federal agencies, and three industry groups or companies. ER216–19. It received and considered extensive comments that it incorporated in the regulations. ER245–51, ER319–33.

The Service gave special consideration to the Hanna Shoal Walrus Use Area, a critical foraging area for walruses. ER285. The agency found that impacts during the five-year regulations would be negligible. Even though the Hanna Shoal Walrus Use Area may have high concentrations of walruses, "[m]ost of the lease sale blocks in the [Hanna Shoal] region are currently not leased," so activity there is limited. ER312. "[A]dditional mitigation measures may be anticipated to limit disturbances and impacts to Pacific walruses when they are using this area." *Id.*; *see* Section I.B.

As explained further in Section I.B., the Service reasonably determined it would ensure take authorized in LOAs is consistent with the regulations and will have no

more than a negligible impact on walruses both in and outside of the Hanna Shoal Walrus Use Area by considering the nature, location, and timing of proposed activities, the current distribution of walruses, and any other relevant information, and imposing mitigation measures tailored to the LOA's proposed activities and information about current walrus distribution. ER317–18; ER285. If the Service finds a proposed activity is likely to impact walruses in a non-negligible way, it will consider whether additional mitigation and monitoring can reduce potential impacts. ER318; ER285. If not, it may restrict operations or disapprove the LOA. ER317. In fact, the regulations explain the Service is unlikely to authorize LOAs for higher-risk activities, such as seismic surveys and exploration drilling, in the Hanna Shoal Walrus Use Area during summer when many walruses are there. ER318; ER313.

In considering the foregoing, as well as Congressional direction to balance the probability of impacts with the potential severity of the harm, the Service reasonably concluded that, with mitigation and monitoring, any incidental take reasonably likely to result from the effects of oil and gas exploration activities during the five-year term, including in the Hanna Shoal Walrus Use Area, will no more than negligibly impact the Pacific walrus. ER317–18; ER213. The activities will not cause any "significant behavioral responses" that will disrupt walruses' "normal activities," ER213, or "affect

the annual rates of recruitment or survival" of the walrus population. ER317.[4] The Service did not defer its negligible impact finding to the LOA process. ER317–18.

### B. The Service thoroughly detailed all mitigation measures, but could not explain in more detail some of the additional mitigation measures it might apply in the Hanna Shoal Walrus Use Area because those additional measures are meant to be tailored to current information.

The League asserts, at 7, 10, that the Service could not reasonably make its negligible impact finding in the regulations because it plans to evaluate each LOA for the Hanna Shoal Walrus Use Area and determine whether additional mitigation is needed then, rather than detailing all required Hanna Shoal mitigation in the regulations. This claim has no foundation in the record. The regulations thoroughly detailed mitigation measures and their effectiveness, and explained the kinds of additional measures that could apply in the Hanna Shoal Walrus Use Area. More detail was not necessary—or even possible—for additional measures that are proposed in LOA applications for specific activities and required by the Service to respond to current information resulting from continual monitoring of walruses.

The regulations explained that the following mitigation measures would apply to all LOAs: (1) a prohibition on activities before July 1; (2) a requirement that vessels be staffed with observers to initiate adaptive mitigation responses when walruses are

[4] The Service also made the small numbers finding required by the Marine Mammal Act and thoroughly detailed the "means of effecting least practicable adverse impact" on walruses. ER311–14. Though the League challenged the small numbers finding and claimed that the Service did not adequately detail means of effecting the least practicable adverse impact in district court, it has not made these arguments here.

observed; (3) establishment of set-back distances between walruses and vessels and aircraft; (4) a requirement that offshore activities that cause noise impacts establish and monitor acoustic exclusion and disturbance zones, and are shut down whenever twelve or more walruses are detected; and (5) a restriction on activities in important buffer areas and within a 40-mile radius of coastal communities along the Chukchi Sea to protect migrating or hauled-out walruses. ER313–14; ER323. This list is not exhaustive. *See, e.g.,* 50 C.F.R. § 18.118(a); ER304–05; ER7–15.

These requirements "encompass the overall suite of measures that are necessary to ensure the activities affect only small numbers" of walruses and "have no more than a negligible impact on the stocks." ER324–25 (Comment 33 response); ER322–23 (Comment 24, 27 responses). Nevertheless, to ensure the greatest protection for walruses, the Service expressly retained the ability to impose additional mitigation measures in all LOAs, ER317, 50 C.F.R. § 18.27(f)(4), and, in particular, to further mitigate offshore exploration activities in the Hanna Shoal Walrus Use Area, ER337. In the Hanna Shoal Walrus Use Area, the Service would require supporting aircraft to avoid operating below 1,500 feet between July 1 and September 30. *Id.*[5] Additional mitigation measures may include "seasonal restrictions, reduced vessel

[5] Though the district court found that the League demonstrated a serious question on the merits because the regulation "is silent as to the substantive criteria that would be used to determine when and what additional mitigation is warranted in the Hanna Shoal," it is possible the court had not reviewed the Service's response to comments, cited in the text, which provide more detail and explain when the Service will impose additional mitigation. Even so, the district court also explained that it "remains firmly of the view that its determination upholding the regulation is correct." ECF79 at 6–7.

traffic, or rerouting of vessels." 50 C.F.R. § 18.118(a)(4)(v); ER318; ER313; ER337. The activities would be seasonally restricted from July to September and vessel traffic and aircraft flights would be rerouted "around walrus travel corridors." ER149. "[C]lose monitoring" of operations would be required to ensure mitigation is effective and to provide insight into walruses' responses to seismic operations to develop future mitigation, as there is currently relatively little data on this issue. ER148–49. The Service also explained that vessel and aircraft restrictions in Ledyard Bay and restrictions against operating within 40-miles of all coastal communities will help mitigate impacts in the Hanna Shoal Walrus Use Area. ER323 (Comment 26 response). It also explained that ongoing cooperative studies will generate useful information to develop additional mitigation. *Id.* (Comment 27 response).

The Service could not detail these site-specific mitigation measures further in the regulations because they are intended to address real-time information. In responding to a comment asking for more detail on Hanna Shoal mitigation measures, the Service explained that it plans to apply the general mitigation measures found in the regulations to address real-time information. ER323 (Comment 26 response); *see also* ER336 (explaining criteria used to evaluate LOAs). For example, the timing and movement routes of walruses are variable, ER313, but will be monitored, ER323. "When a coastal walrus haulout develops," the Service would work with other federal agencies "to establish airspace closures and marine buffer areas around the haulout," which "remain . . . until the haulout disbands." ER323 (Comment 26 response). Sea

ice also changes. Because these measures "require[] a real-time assessment of walrus densities, weather conditions, and potential changes in conditions, which in turn, are based on actual ice dynamics," the Service found that adding more provisions in the regulations would not "be beneficial." ER325 (Comment 36 response).

"Similar mitigation measures and monitoring requirements in prior incidental take authorizations for the Chukchi Sea have proved highly effective at eliminating or mitigating adverse impacts to Pacific walruses." ER313; ER306. The incidental take that has occurred has been limited to short-term, temporary behavioral responses, such as avoiding or moving away from the activity. *Id.*; ER316. Moreover, the measures were "updated with the best scientific evidence" and "made more restrictive." ER313. Based on this past experience, the Service reasonably concluded that these measures "minimize interference with normal breeding, feeding, and possible migration patterns to ensure that the effects to the species remain negligible." ER317; ER307. The Service's explanation of its mitigation measures is more than sufficient. *Tillamook Cnty. v. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) (agency need only develop proposed mitigation "'to a reasonable degree,'" but need not "develop a complete mitigation plan detailing the 'precise nature . . . of the mitigation measures.'").

It is also important to note that, when issuing LOAs, the Service is required to ensure that they are consistent with the regulations' negligible impact findings. The Service is not, as the League claims, deferring the negligible impact finding to a non-public LOA process. If an LOA is inconsistent with the regulations, it cannot be

issued. ER318; ER313. Moreover, LOAs may be withdrawn or suspended, either individually or class-wide, when monitoring required by the regulations and LOAs reveals actual impacts are more than negligible. 50 C.F.R. § 18.27(f)(3)–(5).

By retaining the ability to impose additional mitigation measures on a case by case basis, to withdraw LOAs or impose additional mitigation if monitoring reveals more than negligible impacts, or to deny LOAs entirely, the Service can quickly adapt its approach to take into account current information on actual walrus distribution and the timing of the proposed activity. ER318; ER320 (Comment 4 response). This adaptive approach "is a responsible decision in light of the inherent uncertainty of environmental impacts" resulting from activities that might be proposed during the regulations' five-year life span. *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010); *Ctr. for Biological Diversity v. Kempthorne*, 3:07-cv-00141-RRB, ECF91 at 11–12 (D. Alaska) (ER364–65) (finding that the Service's negligible impact finding in 2006 incidental take regulations for the Beaufort Sea properly relied on mitigation measures that would be imposed in LOAs).[6] It ensures that the non-lethal incidental take authorized in LOAs will result in no more than a negligible impact on the Pacific walrus population. ER317–18. This flexibility to incorporate new information and mitigation measures is even more important in light of the challenges posed by climate change, which can alter the distribution of walruses. ER318.

[6] This Court affirmed those regulations. *Kempthorne*, 588 F.3d at 710–11. It has also approved the use of adaptive management and mitigation. *Pac. Coast Fed'n of Fishermen's Assocs. v. Blank*, 693 F.3d 1084, 1103 (9th Cir. 2012) (citing cases).

The League also asserts, at 7, that the Service's interpretation of the statute as permitting it to impose additional mitigation in an LOA without fully identifying those measures in the regulations is unreasonable under *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984). The League did not make this argument below, and thus it cannot support its assertion that it is likely to succeed on appeal.[7] Even if the Court considers this argument, the Service did not, as the League asserts, at 10, interpret the statute as authorizing a deferred negligible impact finding. As shown herein, the Service found the incidental take detailed in the regulations would result in a negligible impact on the walrus population based on the agency's consideration of all relevant information and on the imposition of mitigation measures detailed in the regulations.

### C. The Marine Mammal Act's notice and comment requirement was served here because the Service provided enough detail to enable extensive comment and incorporated that information in the final regulations.

The League complains, at 8–10, that the fact that the Service might issue individual LOAs that contain additional mitigation measures deprives the public of the

[7] The district court found that 16 U.S.C. § 1371(a)(5)(A)(i)(II)—which requires the Service to include "means of effecting the least practicable adverse impact" in the regulations—is ambiguous and does not plainly require the Service to include every measure in the regulations. Thus, the Service permissibly construed the statute by establishing an LOA process that imposes additional mitigation, particularly because LOAs are published and subject to judicial review. ECF59 at 14–15; *Kempthorne*, 588 F.3d at 712 (upholding 2006 Beaufort regulations, stating that "LOAs include mitigating guidelines"). The district court did not, however, address *Chevron* or the Service's interpretation of the statute when considering whether the Service's negligible impact finding is arbitrary, which is the issue the League newly presents here.

opportunity to comment required by 16 U.S.C. § 1371(a)(5)(A)(i).[8] The Hanna Shoal provision in the proposed regulations and draft EA was sufficiently detailed to "fairly apprise interested persons of the subjects and issues" and to allow public comment. *Natural Res. Def. Council v. EPA*, 863 F.2d 1420, 1429 (9th Cir. 1988) (discussing the APA's notice and comment provision) (citation omitted).

The draft regulations and EA placed the public on notice that any application for an LOA for activities in the Hanna Shoal Walrus Use Area might not authorize incidental take during times of high walrus use or could contain additional mitigation measures to ensure the least practicable adverse impact to the species. ER319. The Service received numerous comments from federal and state agencies, private companies, trade and environmental organizations, and the general public, *id.*, including extensive comments on mitigation measures generally and in the Hanna Shoal Walrus Use Area. ER322–25 (Comment 24, 25, 26, 27, 31, 33, 36 responses). The Service considered these comments and incorporated them into the final regulations. *See, e.g.,* ER319 (Hanna Shoal provision changed due to public comment); ER323 (Hanna Shoal Walrus Use Area defined); ER247–48 (mitigation measures and Hanna Shoal provisions described in more detail); ER250 (same). The Service's regulations were sufficiently detailed to satisfy the statute's requirement that

[8] The district court also found the existence of a serious question because there is only public notice for the subsequent LOA process, ECF79 at 6, but a detailed review of the comment process here reveals there is no question that the regulation was sufficiently detailed to enable adequate public participation, ER319.

regulations be promulgated after "notice . . . and an opportunity for public comment," 16 U.S.C. § 1371(a)(5)(A)(i), and the purpose of that requirement was clearly served.

## II. The League has not demonstrated a likelihood of success or any serious questions on the merits of its NEPA claim.

The League asserts, at 11–12, that it is likely to succeed on the merits of its claim that the Service's finding of no significant impacts was arbitrary. Like its Marine Mammal Act claim, the League's NEPA claim rests on its erroneous assertion that the Hanna Shoal Walrus Use Area mitigation measures were not detailed enough to support the Service's finding that environmental impacts are insignificant. The League's claim lacks merit. The Service fully complied with NEPA. It carefully evaluated the potential impacts of oil and gas exploration, thoroughly detailed and evaluated the effectiveness of mitigation measures, and reasonably concluded that, with mitigation, the regulations would not have a significant environmental impact.

The EA (and regulations) demonstrate that the Service thoroughly considered the affected environment, the potential impacts of proposed activities, and the potential environmental consequences, and identified, described, and evaluated the effectiveness of mitigation measures designed to minimize potential impacts. ER88–92; ER92–118; ER144–58; ER179–212. As explained in Section I, these mitigation measures include those required by the underlying Lease Sale 193 Stipulations (which were analyzed in the EIS for the Lease Sale), ER178, ER193–96, ER343, ER345, and those required by the incidental take regulations, ER196–212. The measures include

requirements for monitoring and surveying animal populations, operational restrictions, noise restrictions, conflict-avoidance mechanisms, and spill-prevention measures. ER193–212; ER7–15. They are mandatory for all LOAs. ER305. The regulations provide that additional site-specific mitigation may be developed when issuing LOAs, ER307, particularly in the Hanna Shoal Walrus Use Area, ER337; 50 C.F.R. § 18.118(a)(4)(v). The EA explained how mitigation will reduce the potential impacts of noise, vessel, aircraft, off-shore drilling, human presence, and fuel and oil spills. ER146–58. With such measures, there have been no known walrus injuries or deaths and only negligible impacts. ER306; ER316; ER148–58; ER193–213; ER276.

Based on "the results of over 20 years of data on the encounters and interactions between polar bears, Pacific walruses, and Industry; recent studies of potential effects of Industry on these species; oil spill risk assessments; potential and documented Industry impacts on these species; and current information regarding the natural history and status of polar bears and Pacific walruses," ER276, the Service reasonably concluded that, with the mitigation in place, the incidental take covered by the regulations would not have significant environmental impacts. ER274–75; ER148–58; ER193–213. All of the anticipated activities would either take place largely in open water, away from significant concentrations of walruses, or be short-term with only transitory effects. ER148–58. Seismic surveys would occur away from high walrus concentrations and would be subject to mitigation, such as exclusions zones around sound-producing devices. ER149. The same is true of drilling activities, which

are localized and mostly conducted on open water. ER151–52. Vessel and aircraft exclusion zones, monitoring for walruses, and extensive operating restrictions would render remaining impacts insignificant. ER152–53. "[I]t was not arbitrary and capricious for [the Service] to determine that the impacts would not be significant with these mitigation measures in place." *Envtl. Prot. Info. Ctr. v. Forest Serv.*, 451 F.3d 1005, 10116 (9th Cir. 2006); 76 Fed. Reg. 3843, 3847–48 (Jan. 21, 2011).

The League asserts, at 11–12, that the Service's FONSI was unlawful because the Service did not thoroughly explain how the mitigation measures reduce the impact on walruses in the Hanna Shoal Walrus Use Area. To the contrary, the Service predicted that many walruses could be nearby, and, thus, that activities "may require close monitoring and additional special mitigation procedures, such as seasonal restrictions (e.g., July to September)" of "activities from Hanna Shoal and rerouting vessel traffic and aircraft flights around walrus corridors." ER149. The Service did not need to (and indeed could not) detail all such mitigation measures when they are designed to respond to real-time information. *See* Section I.A–B; ER248–94. This Court has made clear that an agency adequately addresses uncertainty where it makes "reasonable predictions on the basis of prior data." *Kempthorne*, 588 F.3d at 712. The mitigation was "developed to a reasonable degree and had been reviewed" by the agency when it issued the regulations; NEPA requires no more. *Wetlands Action Network v. Army Corps*, 222 F.3d 1105, 1121 (9th Cir. 2000). The Service reasonably

relied on proven mitigation and on its ability to require additional mitigation to support its finding of no significant impacts.

## III. The League has not shown irreparable harm, and both the balance of equities and the public interest weigh heavily against an injunction here.

To obtain an injunction, the League must show it is likely to suffer irreparable harm. *Winter*, 555 U.S. at 20–22. The League must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. A court must balance competing claims of injury and consider its ruling's impacts on each party. *Id.* Environmental harm may be outweighed by other considerations. *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010). The League has not shown a likelihood of irreparable harm or that the balance of equities and public interest favor an injunction.

The League asserts, at ii–iii, 12–19, that the activities covered by regulations and the Shell LOA will harm the Pacific walrus, in turn harming its members. But the League is simply registering disagreement with the merits of the Service's scientific findings, relying largely on a declaration that addresses a separate agency action (the Shell LOA) not challenged here.[9] Here, the Service determined that non-lethal take

[9] To the extent the League seeks to enjoin the regulations on the basis of the Ragen declaration, Mot. Ex. 17 ¶¶ 12–18, which asserts harm resulting from the Shell LOA, it is entirely inappropriate for this Court to rely on it because the League has not challenged the Shell LOA in this suit. The Shell LOA is a separate final agency action with a separate administrative record not yet before any court. Mot. Ex. 16 (ECF63). The declaration should also be rejected because it relies on the Service's finding that listing walrus under the ESA is warranted. Mot. Ex. 17 ¶¶ 4–8 (ECF63-2). The finding

covered by the regulations would have only a negligible impact on Pacific walrus when mitigation measures are implemented. ER313.[10] Anticipated take would be limited to minor behavioral modifications due to temporary, nonlethal disturbances, is unlikely to affect rates of overall population recruitment or survival, and will only impact a relatively small number of walruses. ER297; ER306–07; ER314; ER250. The Service found a negligible impact even with the challenges posed by climate change, though it found that its adaptive mitigation approach and monitoring requirements imposed by the regulations were especially important to enable it to address the uncertainties posed by climate change. ER178–79; ER181–82; ER186–89; ER191. The Service is unaware of any information developed since issuing the regulations that contradicts its finding that activities will have only negligible impacts. ER348–49 ¶ 8 (ECF72-1). And if monitoring reveals more than negligible impacts before the five year period expires, "the Service can reassess the impacts of the [regulations]," adapt to those circumstances, and develop additional mitigation measures. ER178–79; ER191. The League has not shown irreparable harm.

---

does not equate to a listing under the ESA—it is one step in the statutory process of determining whether a species should be listed as threatened or endangered—and the "warranted" finding does not affect the Service's ability to issue incidental take regulations under the Marine Mammal Act. ER347 ¶ 3 (ECF72-1). Finally, because the warranted determination predates the regulations, the Service considered the determination when it found that the regulations would have only a negligible impact.

[10] The Service reaffirmed its determination in issuing the June 30, 2015 Shell LOA, Mot. Ex. 16 (ECF63-1), and added additional mitigation measures to protect Pacific walruses in the Hanna Shoal Walrus Use Area. ER348–49 ¶¶ 7, 8 (ECF72-1).

By contrast, if the regulations are enjoined, the Service will be forced to divert its resources away from high-priority conservation activities to individually process industry requests as Incidental Harassment Authorizations, which are not as comprehensive as the regulations. ER348–49 ¶ 8 (ECF72-1); ER275. There would be no guarantee that industry would implement the regulations' useful mitigation and monitoring measures. ER274–75 (no action alternative). Moreover, an injunction would threaten Shell's multi-billion dollar investment and risk losing hundreds of jobs for local Alaskans and Alaskan Natives. Mot. Ex. 22 at 3–6 (ECF74 ¶¶ 9–11); ER351–52 ¶¶ 4–8 (ECF72-2). The balance of the equities clearly weighs against an injunction.

The balance tips further against an injunction where the League lacked diligence in challenging and seeking to enjoin the regulations. Delay is measured from the date agency approval is given. *Apache Survival Coal. v. United States*, 21 F.3d 895, 906 (9th Cir. 1994). Though the League asserts, at iii–v, 19, it was diligent, it fails to explain why it waited almost a year and a half after the regulations were issued in June 2013 before filing its complaint in November 2014, and then another eight months before moving to enjoin the regulations in July 2015, when Shell filed its application in September 2014 and stated activities would start in July 2015.[11] This delay weighs heavily against an injunction. ECF79 at 7–8; *W. Watersheds*, 692 F.3d at 923.

---

[11] At a minimum, the League was notified of Shell's application when the Association filed it on December 17, 2014. Mot. Ex. 1 (ECF10-6); ECF47 at 17–18 (League's summary judgment brief). It still delayed nearly eight months. The Service issued other LOAs, ECF54, that the League could have challenged and sought to enjoin.

The public interest also weighs against an injunction. Activities here occur under the Outer Continental Shelf Lands Act, which "expeditious[ly]" promotes oil and gas development to reduce foreign oil dependence. 43 U.S.C. § 1332(3); H.R. Rep. 95-590, at 53, 57 (1977) (1978 U.S.C.C.A.N. 1450, 1460, 1464). In assessing the public interest, the Court should be mindful of this Congressional intent. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (courts cannot "override Congress' policy choice, articulated in a statute"). When assessing the harms, equities, and public interest, this Court should find that an injunction is unwarranted.

Finally, if the Court finds an injunction is warranted, the League's request is overly broad. The League challenged only the Hanna Shoal provision of the regulations concerning take of Pacific walruses. It has not amended its complaint to challenge the Shell LOA, which is a separate agency action for which there is a different administrative record. Nor has it challenged the portion of the regulations pertaining to polar bears. An injunction against the regulations in their entirety and the Shell LOA is thus unwarranted, and the Court should limit any injunction to the claims the League has made. *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 162–64 (2010).

## CONCLUSION

The emergency motion for an injunction pending appeal should be denied.

Respectfully submitted,

*/s/ Thekla Hansen-Young*
JOHN C. CRUDEN
Assistant Attorney General

*Of counsel:*
KENNETH M. LORD
Office of the Solicitor
Dep't of the Interior
Anchorage, Alaska

JENNIFER S. NEUMANN
MEREDITH FLAX
DAVID B. GLAZER
THEKLA HANSEN-YOUNG
Attorneys, U.S. Dep't of Justice
Env't & Natural Resources Div.
P.O. Box 7415 (Ben Franklin Station)
Washington, DC 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

July 31, 2015
90-8-6-07793

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 31, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also mailed, via overnight Federal Express, one courtesy copy of the foregoing to the Clerk of the Court.

*/s/ Thekla Hansen-Young*
THEKLA HANSEN-YOUNG
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov