Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs-Appellants Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Resisting Environmental Destruction on Indigenous Lands, and Sierra Club*

Nathaniel S.W. Lawrence (Wash. Bar No. 30847)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Jared E. Knicley (Va. Bar No. 84060)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6242 / F: 202.289.1060
E: jknicley@nrdc.org

*Attorneys for Plaintiff-Appellant Natural Resources Defense Council*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| ALASKA WILDERNESS LEAGUE, ET AL., *Plaintiffs-Appellants*, v. SALLY JEWELL, ET AL., *Defendants-Appellees*, and ALASKA OIL AND GAS ASSOCIATION, *Intervenor-Defendant-Appellee*. | No. 15-35559 **APPELLANTS' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** |

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. The Secretary Violated the MMPA.

The merits of Appellants' core MMPA claim are dispositively settled by Appellees' concession that the statute requires an up-front negligible impact finding (based on total take), Fed. Op. at 14, 18 (Appeal Dkt. 11-2); Int. Op. at 8 (Appeal Dkt. 12-1), which the record unequivocally shows was not made in the incidental take rule here for the large and vital Hanna Shoal region. The performance of past take rules is immaterial, because the Secretary herself emphasizes how fundamentally walrus behavior has recently changed in the area. Appellees are wrong to suggest that the take rule here includes either a comprehensive or detailed list of mitigation for the Hanna Shoal region. And at all events, the Secretary's ability to identify and impose sufficient mitigation through the later LOA process cannot satisfy the statutory requirement of an up-front finding of negligible impact from total take that is concededly an absolute prerequisite for a take rule.

First, the final take rule cited by the Federal Appellees as establishing negligible impact findings, *see* Fed. Op. at 11-12 (citing ER285), in fact demonstrates the opposite. The Secretary concluded she could *not* make a negligible impact finding for the Hanna Shoal area when she issued the regulation: for the Hanna Shoal area "*additional* mitigation measures . . . *may be necessary* . . .

[to] ensure consistency with [the] MMPA mandate[] . . . [of] negligible impacts" and only "as individual LOA applications are received" will the Service "consider *whether* additional mitigation . . . *could* reduce any potential impacts to meet the . . . negligible impact standard[]." Mot. Ex. 2 at 9 (Appeal Dkt. 9-3) (second–third column) (emphasis added); *see* Mot. at 5-6 (Appeal Dkt. 9-1). The Secretary acknowledged similar uncertainty about impacts to walruses in travel corridors to the Hanna Shoal area from distant coastal haulouts. Mot. Ex. 2 at 32 (third column).

Appellees' argument that past experience justifies a negligible impact finding, Fed. Op. at 3-4, 11, 16; Int. Op. at 1, does not overcome the Secretary's frank concession that she could not conclude impacts of activities around the Hanna Shoal area would be negligible absent unspecified mitigation, or even whether adequate mitigation was possible. Equally fatally, it ignores the Secretary's underlying conclusions in this rulemaking that dramatically different conditions now obtain: "a new pattern of walrus distribution and movements has emerged," Mot. Ex. 4 at 49 (Appeal Dkt. 9-5), due to recent sea-ice loss, leaving "large numbers of walruses," "at times reaching numbers of tens of thousands of animals" that "could be encountered" by industry activities in the open waters of the Hanna Shoal area and its travel corridors, thus leaving walruses exposed to

potentially significant impacts in open waters unlike at any time in the past, Mot. Ex. 2 at 9 (first, second column).

Appellees are wrong that the take rule "thoroughly detailed mitigation measures . . . and explained the kinds of additional measures that could apply in the Hanna Shoal Walrus Use Area." Fed. Op. at 13. Their brief cites at length to the take rule's response to public comments section, which discusses what it calls "the overall suite of measures" that might be applied. *Id.* at 14-15. First of all, the Secretary conceded the generally applicable measures may not suffice to reduce impact to negligible for the Hanna Shoal area. Mot. Ex. 2 at 9 (second–third column), 61 (third column). As to Hanna Shoal measures, the take rule itself lists only one specific mitigation, lumps all others together in a generic category of "seasonal restrictions, reduced vessel traffic, or rerouting," *id*. at 61 (third column), and is explicit that the vague list is non-exclusive, *id.* And, again, the Secretary found that the take rule as adopted did not assure against more than negligible impact—she would have to determine later "whether" additional mitigation "could" reduce impacts to negligible in the Hanna Shoal area. *Id.* at 9 (third column).

Appellees also argue that the Secretary's approach is defensible because it implements adaptive management. Fed. Op. at 17, 22-24. Of course, adaptive management can be applied in a manner consistent with statutory mandates. In

this rule, for example, the Secretary has adopted mitigation measures unchallenged by Appellants that incorporate real-time monitoring. *See, e.g.*, Mot. Ex. 2 at 62-63. But the agency cannot defer critical decisions necessary to meet the MMPA's negligible impact standard to a later, non-public process simply by invoking the label "adaptive management." The MMPA requires those protections be forged up front through notice-and-comment rulemaking.[1] If the needed mitigation for a proposed take rule cannot be assessed adequately in the rulemaking to assure compliance with a fundamental predicate for all take rules then, plainly, the rule as proposed cannot be adopted consistent with the MMPA's restrictive requirements.

Appellees also, mistakenly, appear to suggest that the Secretary's ability to impose additional mitigation measures through the LOA process or deny LOAs for the Hanna Shoal area outright renders her negligible impact finding lawful. Fed. Op. at 14, 16-17; Int. Op. at 8. But, despite Appellees' disavowal, Fed. Op. at 18, this defense hinges on the premise that the MMPA allows the Secretary to promulgate a take rule without knowing total take will be negligible as long as she

---

[1] The cases cited by Federal Appellees, Fed. Op. at 17, are for these reasons inapposite. They address NEPA's requirements for the discussion of mitigation measures in an environmental impact statement. In that different statutory context, unlike the MMPA (or a FONSI under NEPA, *see infra* at 6-7), the agency is under no duty to find affirmatively that mitigation measures will bring impacts below a certain level. Moreover, unlike here, the agencies in those cases provided "detailed mitigation evaluations," *Pac. Coast Fed'n of Fishermen's Assoc's v. Blank*, 693 F.3d 1084, 1103 (9th Cir. 2012), and "a detailed, thirteen-page list of specific protective measures" to be applied, *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 516 (D.C. Cir. 2010).

tries to address the gap later, *i.e.*, that it allows her to defer her negligible impact finding. As Appellants describe, Mot. at 7-9, the statute does not so allow—and Appellees offer no rebuttal whatsoever of Appellants' argument.[2] The MMPA provides a different, more project-specific, mechanism—the incidental harassment authorization, *see* 16 U.S.C. § 1371(a)(5)(D)(i)—for instances in which uncertainty precludes an up-front finding for a broad class of activities in an area. *See* Mot. at 9.

Finally, Appellees mischaracterize the dispute by arguing that Appellants challenge the LOA process itself, Fed. Op. at 9-10. Appellants do not dispute that the process has a legitimate function of assuring that individual activities comport with a governing take rule, Mot. at 3-4, 8 n.4, or that the Service may choose to include in a LOA "additional terms and conditions," *see* 50 C.F.R. § 18.27(f)(4). However, that agency-created process to check activities against a take rule's properly made findings, or the latitude it defines to impose some additional terms in a LOA, does not provide license to postpone compliance with key statutory predicates to the adoption of a take rule in the first place.

---

[2] Appellees' assertion, Fed. Op. at 23, that Appellees did not raise this plain meaning statutory argument in the district court is false: as here, it was the core of the argument. *See* Plaintiffs' Opening Brief at 21-23, 25-27 (Dist. Ct. Doc. 47). Appellees' motion here only points out the uncontested governing law about statutory interpretation.

Federal Appellees' related argument that the draft take rule was sufficiently detailed to satisfy the MMPA's public notice and comment requirement, Fed. Op. at 23-25, notwithstanding deferral of key mitigation determinations to the LOA, also does not withstand scrutiny. The proposal for the take rule asserted that "we do not anticipate issuing any LOAs for seismic or drilling activity in the Hanna Shoal region during the 5-year span of these proposed regulations." Fed. Op. App. at ER057 (second column) (Appeal Dkt. 11-3). Consequently, the provision describing the contingent Hanna Shoal area measures, 50 C.F.R. § 18.118(a)(4)(v), Mot. Ex. 2 at 61 (third column), only appeared in the final rule and not in the proposed rule published for comment, Fed. Op. App. at ER068 (second column). And the final rule never resolved the basis for the finding—whether future mitigation could ensure negligible impacts in the Hanna Shoal area—so there was no way to comment on it. *See* Mot. at 8,10.

B. <u>The Service's Finding of No Significant Impact Under NEPA Was Unlawful</u>.

Federal Appellees' assertion that it is acceptable under NEPA to defer determining key mitigation measures for the Hanna Shoal area to the later, non-public LOA process, *see* Fed. Op. at 20-21, is contrary to the Circuit precedent cited in Appellants' motion, Mot. at 11-12. Federal Appellees ignore that precedent and are unable to explain how the EA's list of three broad categories of

potential Hanna Shoal-specific mitigation measures, Mot. Ex. 4 at 27, satisfies NEPA's most basic requirements for mitigated FONSIs.[3] *See* Mot. at 12.

## II. APPELLANTS' EVIDENCE OF IRREPARABLE HARM FROM SHELL'S PLANNED DRILLING THIS SUMMER IS NOT CONTRADICTED BY THE TAKE RULE AND THE BALANCE OF HARMS FAVORS RELIEF.

Appellants proffered expert evidence by Dr. Timothy Ragen of likely irreparable population-level harm to walruses as a result of Shell's planned drilling activities this summer in the Burger Prospect. *See* Mot. Ex. 17 (Appeal Dkt. 9-18). Appellees have submitted no counter declaration. The only evidence in rebuttal to Dr. Ragen's declaration they offer is a recitation of the take rule's rote negligible impact finding and the LOA. But because the take rule postponed consideration of the total harm to walruses from activity in the Hanna Shoal region to the later LOA process, *supra* at 1-2, the take rule does not address the evidence of harm from Shell's specific operations in and around the Burger Prospect portion of the Hanna Shoal region described in Dr. Ragen's declaration. *See* Mot. Ex. 17 at 7-9, ¶ 10-12. The LOA does not controvert Dr. Ragen's analysis or conclusions either,

[3] The cases Federal Appellees do cite, Fed. Op. at 22, are inapposite. In *Wetlands Action Network v. U.S. Army Corps of Engineers,* the agency had determined the necessary mitigation (a fifty-one acre mitigation bank) and required the permittee to meet "extremely detailed" specifications when implementing the measure. 222 F.3d 1105, 1121-22 (9th Cir. 2000). Likewise, in *Center for Biological Diversity v. Kempthorne* the mitigation measures were "*all* explicitly analyzed in the EA." 588 F.3d 701, 711-12 (9th Cir. 2009) (emphasis added).

*contra* Fed. Op. at 24 n.10; Int. Op. at 12, for it also does not analyze those impacts or add any analysis beyond the rule.[4]

By contrast, after reviewing Shell's specific plans and the requirements in both the final take rule and the LOA, Dr. Ragen unambiguously concluded that "Shell's proposed activities will harm the Pacific walrus stock." Mot. Ex. 17 at 3, ¶ 3.[5] Even using Shell's own figures for how many walruses will be affected—figures that he explains are under estimated—Dr. Ragen concluded that Shell's planned activities would displace thousands of walruses from their foraging grounds, compounding stressors that have already resulted in a dramatic reduction

---

[4] Indeed, when describing the LOA, the Federal Appellants' own declarant states that "[t]he best available information regarding the likely effect of Shell's planned operations, including implementation of the required mitigation measures, is found in the [take rule]." Fed. Op. App. at ER348, ¶ 7 (Appeal Dkt. 11-4).

[5] Federal Appellees' attempts to disqualify the Ragen declaration, *see* Fed. Op. at 23 n.9, are perplexing. Dr. Ragen necessarily addressed the Shell LOA because the LOA is the *only* place where *all* Hanna Shoal-specific mitigation measures for Shell's operations under the take regulation can be found. *See supra* at 1-2. Dr. Ragen thus had to consider the LOA's requirements to evaluate potential harm to the walrus population from Shell's operations as they will be carried out, absent an injunction. *See* Int. Op. at 12. Dr. Ragen referenced the Service's determination that walrus "warranted listing under the Endangered Species Act" not because of any legal implication of that determination, but because it reflects the Service's own acknowledgement of the walrus population's decline and loss of foraging habitat. Mot. Ex. 17 at 5, ¶ 6.

in numbers, and will likely cause irreparable harm to the walrus population. *Id.* at 12-14, ¶¶ 16, 17.[6]

Although Appellees imply that the harm Dr. Ragen identifies is not serious because it stops short of immediately observable mortalities, Congress did not see it that way. The MMPA prohibits all behavioral harassment of marine mammals, unless the impact is negligible. 16 U.S.C. § 1371(a); *id.* § 1371(a)(5)(A)(i)(I).[7] Nor do the limitations on activity inside the Hanna Shoal Walrus Use Area first identified in the June 30, 2015 LOA, Int. Op. at 12, undercut Dr. Ragen's conclusions, because as he explains, the month-to-month 50 percent utilization distribution boundary set in the LOA leaves unprotected the remaining "half of all foraging areas used by the walrus," including the Burger Prospect. Mot. Ex. 17 at 8, 14-16, ¶¶ 11, 18.

---

[6] Intervenor Appellees' attack on Dr. Ragen's credibility, and attempt to minimize his conclusions, has no basis. Int. Op. at 14. Dr. Ragen is a prominent Arctic pinniped scientist (walruses being, of course, pinnipeds) whose expertise is in population dynamics. He is a former executive director of the Marine Mammal Commission, the independent federal agency that Congress charged with reviewing marine mammal population conditions and overseeing federal marine mammal programs, 16 U.S.C. § 1402(a), (d), and he commented on the proposed take rule at issue here in his official capacity, Int. Op. Ex. at ER 000022-30 (Appeal Dkt. 12-3).

[7] Intervenor Appellee's argument is not advanced by its reliance on *Fund for Animals v. Frizzell*, involving an "abundant game species." 530 F.2d 982, 987 (D.C. Cir. 1975). Unlike in that case, Appellants present expert evidence of population-level impact.

Intervenor Appellee incorrectly asserts no irreparable harm will occur to Appellants' members. Int. Op. at 9, 14-15. Appellants' members have submitted sworn declarations detailing specific personal economic, cultural, academic, and recreational interests in Pacific walruses. *See* Mot. at 13 n.5. Shell's operations are "well underway", Snyder Decl. at ¶ 4 (Appeal Dkt. 12-2), and will likely irreparably harm the walrus population to Appellants' members' detriment. Detailed, unrebutted, admissible evidence is not a "mere[] alleg[ation]" of imminent harm, such as that found insufficient in *Caribbean Marine Services Company v. Baldrige*, 844 F.2d 668, 674-75 (9th Cir. 1988).

Appellants do not need to challenge Shell's LOA to get the relief they seek here. *Contra* Fed. Op. at 23 n.9; Int. Op. at 3-4, 10-11. Though there may well be circumstances in which the violation complained of occurs at the LOA stage, justifying a challenge to the LOA, here Appellants brought a facial challenge to the take rule, based solely on the rule's inadequacies, and the only relief sought here is a stay of the effectiveness of that rule. In these circumstances, a challenge to the LOA is unnecessary. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708-09 (9th Cir. 2009) (plaintiffs can challenge take rule without challenging a specific LOA, even after LOAs have issued). And, as Appellees concede, an injunction of the take rule would prevent Shell from continuing the operations allowed under the LOA. *See, e.g.*, Fed. Op. App. at ER351-52, ¶ 8; Int. Op. Ex. at

ER 000003, ¶ 7. The reason is simple: the LOA is completely derivative of the take rule and, thus, without a valid take rule, there can be no valid LOA. Moreover, given the timing of Federal Appellees' issuance of the LOA, and "the inherent delay of litigation and the irreparable nature of environmental impact," requiring Appellants to challenge that new decision now, on a new record, would unnecessarily delay effective relief. *See Ctr. for Biological Diversity*, 588 F.3d at 709.

Appellees also insupportably attack Appellants' diligence in bringing this case and seeking to prevent Shell from putting the walrus population at risk, *see* Fed. Op. at 25, Int. Op. at 10, when the record shows precisely the opposite. Appellants promptly commenced this challenge after application was filed under the take rule for large-scale activity in an area and manner that ripened their concerns about the possibility of serious harm to walruses from the rule's shortcomings.[8] Thereafter, they proposed or moved to expedite proceedings no fewer than six times, secured a briefing schedule that obviated the need for preliminary relief and sought an injunction pending appeal within days of the Service issuing a LOA. *See generally* Mot. at iii-vi, ¶¶ 4-6. Federal Appellees, in

[8] Prior LOAs under the take rule did not involve the large-scale industrial drilling activities concentrated in critical walrus habitat for the entire summer and fall season that Shell is undertaking here, and, moreover, the Service did not give notice of them until many months after the period for which they were issued. *See* 79 Fed. Reg. 17,564, 17,564-65 (March 28, 2014).

contrast, chose to prolong the proceedings by moving to stay the case, transfer it from a proper forum, have it assigned to a specific judge, and extend the time for filing their district court brief. They also, while awaiting the district court's decision, relied on the challenged regulation to issue a permit authorizing specific take of walruses in the area of concern. *Id.*[9] For its part, Intervenor Appellee took no initiative to expedite a decision, and its member Shell committed resources in full awareness that the take regulation was challenged and prior even to receiving a LOA. Appellants, in short, have exemplified diligence, while Appellees have dragged their feet in court and Intervenor Appellee's member forged ahead in reliance on the challenged rule, together bringing matters to a juncture where preliminary relief is now needed no matter how expeditiously this Court may consider the underlying claims.[10] Though Intervenor Appellee's member has invested considerably in hopes of being able to proceed this summer, were that decisive, compliance with rules governing oil and gas exploration would seldom be enforceable through interim relief. Rather, where—as here—the merits are clear and the environmental harm both likely and substantial, maintaining the status quo

---

[9] *See* Mot. Ex. 24 at 9 (Appeal Dkt. 9-25) (Dist. Ct. Doc. 58); *id.* at 7 (Dist. Ct. Doc. 44).

[10] Intervenor Appellee's complaint that Appellants did not seek an injunction in their summary judgment motion, Int. Op. at 10, is particularly inapt, given the Supreme Court's emphasis that where vacatur alone will provide adequate relief an injunction is not warranted. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

notwithstanding commercial calculations must necessarily be the norm, if Congressional commands are to be reliably given effect.

Respectfully submitted this 3rd day of August, 2015.

| | |
|---|---|
| *s/ Erik Grafe* | *s/ Nathaniel S.W. Lawrence* |
| Erik Grafe | Nathaniel S.W. Lawrence |
| EARTHJUSTICE | NATURAL RESOURCES DEFENSE COUNCIL |
| *Attorneys for Plaintiffs-Appellants Alaska Wilderness League, et al.* | *Attorneys for Plaintiff-Appellant Natural Resources Defense Council* |

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2015, I electronically filed the foregoing APPELLANTS' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 3rd day of August, 2015.

*s/ Erik Grafe*

Erik Grafe
EARTHJUSTICE